No. 45,698

THEODORE W. LORD, SR., *Appellant,* v. R. R. JACKMAN, partner in and for JACKMAN & JACKMAN, and REES JACKMAN, Administrator of the Estate of F. C. Jackman, deceased, partner in and for JACKMAN & JACKMAN, *Appellees.*

(476 P. 2d 596)

Opinion filed November 7, 1970.

*David Skeer,* of Sheffrey, Ryder & Skeer, Kansas City, Missouri, argued the cause, and *Robert P. Anderson,* of Payne, Jones, Anderson, Martin & Payne, Olathe, was with him on the brief for the appellant.

*John A. Emerson,* of Barber, Emerson & Six, Lawrence, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

O'CONNOR, J.: This is an action by plaintiff Theodore W. Lord, Sr., to recover a brokerage commission of $18,279.26 for the sale of 800 shares of corporate stock owned by the defendants, R. R. Jackman and F. C. Jackman.

The narrow question before us for consideration is the propriety of the trial court's order sustaining the motion for directed verdict in favor of defendants.

At pretrial conferences the district court ordered a trial by jury, pursuant to K. S. A. 60-239 (b), on two issues: (1) Was the contract alleged by plaintiff entered into? and (2) If so, was it performed? The case was tried in May 1968 and resulted in mistrial because the jury, although in agreement on the first issue, was unable to agree upon the answer to the second issue. Thereupon, defendants moved for judgment in accordance with their earlier motion for directed verdict at the close of all the evidence (K. S. A. 60-250 [b]). The motion was sustained on the basis there was insufficient evidence to support a finding of the existence of a contract between plaintiff and defendants for payment of a commission as alleged in the petition. Judgment was entered for defendants and plaintiff has appealed.

A brief review of the pleadings will focus the issues submitted to the jury. Plaintiff's petition alleged that on or about April 1, 1963, plaintiff and defendants entered into an agreement whereby plaintiff agreed to attempt to find a purchaser for all the stock of Goffe and Carkener, Inc., part of which was owned by defendants, at a price agreeable to defendants and the other stockholders; and defendants agreed to pay plaintiff three percent of the sale price of such stock upon his producing a purchaser. Plaintiff further alleged that during February 1964 he produced a buyer, ready, willing, and able to purchase the stock at the agreed price. Thereafter, according to the petition, defendants withdrew their offer and refused to pay plaintiff's commission, although defendants and the other stockholders sold their stock in November 1964 for $998,875 to the prospective purchaser obtained by plaintiff. Defendants, in their answer, admitted the sale price of the stock, but denied all other averments of the petition.

Our cases are legion that when there is a challenge to the sufficiency of evidence on an issue of fact by motion for a directed verdict, the court may not weigh conflicting evidence, but is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the motion is leveled; and if the evidence is of such character that reasonable minds may reach different conclusions thereon, the motion for directed verdict must be denied and the issue submitted to the jury. (*Pickens v.*

*Maxwell,* 203 Kan. 559, 456 P. 2d 4; *Elliott v. Chicago, Rock Island & Pac. Rld. Co.,* 203 Kan. 273, 454 P. 2d 124; *Springfield Tent & Awning Co. v. Rice,* 202 Kan. 234, 447 P. 2d 833.)

From the evidence most favorable to plaintiff we piece together these facts.

R. R. Jackman and F. C. Jackman, as partners, owned 800 shares (of a total of 1,305 shares) of stock in Goffe & Carkener, Inc. Plaintiff had known the defendant, R. R. Jackman, for nearly thirty years. As early as 1956, R. R. Jackman told plaintiff that he and his brother, F. C. Jackman, wanted to sell their majority stock interests in the corporation. The minority stockholders objected to any proposed sale of the majority interests only and threatened legal action unless the minority interests were included.

Seven years passed, and in March or April 1963 R. R. Jackman and plaintiff met with Lee Norgren, a business broker in Denver, Colorado, with reference to the sale of all the corporation stock. Although Norgren had apparently expressed some interest in purchasing the stock himself, there was evidence that at this meeting the three of them agreed that in the event plaintiff and Norgren procured a purchaser of the stock, defendants would pay them a fee of six percent of the sale price. As a side agreement, plaintiff and Norgren agreed between themselves to split any fee they received. Jackman suggested the commission be deducted from any purchase price offered so that a "net to seller" price would be quoted to the minority stockholders, thus avoiding any difficulty with those who might object to paying a commission from their share of the purchase price. The sale price of the stock was to be $150,000 over and above the book value as shown in the audited financial statements, with adjustments to market value for assets such as memberships in grain or commodity exchanges and certain securities owned by the corporation.

During the Norgren negotiations, R. R. Jackman informed plaintiff by letter dated June 3, 1963, that the offering price of the stock was $775 per share, and that defendants reserved the right to take the stock off the market at any time.

Norgren soon bowed out of the picture, and through plaintiff's efforts, Rea Tenney, on behalf of himself and his associates, became interested as a potential buyer of the stock. A meeting of plaintiff, Tenney, and the Jackmans was held in August 1963 in Kansas City, where the proposed sale was discussed. According to plain-

tiff, there was no new discussion with the Jackmans about any commission being paid to him. R. R. Jackman recalled that at the meeting he advised Tenney there was to be no responsibility on the part of the sellers for a commission or finder's fee, and Tenney agreed to "take care of" plaintiff. Later, when Tenney was ready to submit a firm offer, plaintiff, at Tenney's request, sent the Jackmans a letter dated January 30, 1964, stating:

"This letter covers my introduction to you of Rea C. Tenney, Houston, Texas with reference to his group's prospective purchase of the common stock of Goffe & Carkener, Inc., Kansas City.

"My compensation in this transaction will come from the Tenney group and therefore you are released from liability for any compensation on this particular introduction.

"This release also applies to all minority stockholders of Goffe & Carkener, Inc."

In the meantime, during December 1963, while the Tenney negotiations were still in progress, plaintiff received permission from R. R. Jackman to submit the sale proposal to one A. Vincent Blackford. Plaintiff and Blackford discussed the matter on five or six occasions, and Blackford reviewed the corporation's financial statements. On January 9, 1964, (which was prior to plaintiff's letter of January 30, 1964, to Jackmans) plaintiff called R. R. Jackman, in Phoenix, Arizona, and advised him that Blackford was ready, willing, and able to buy the stock at the offered price, and wished to come to Phoenix to meet with Jackman. Jackman told plaintiff he felt morally bound to wait to see what happened on the Tenney deal; but if it did not go through, defendants would be happy to make "the same offer" to Blackford. In further explanation of his telephone conversation with Jackman, plaintiff testified:

"Q And in that telephone conversation was anything said about your fee or commission?

"A Nothing more than that Mr. Blackford was a ready buyer at the asking price plus commission.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q How would that have been handled? How would that be handled mechanically?

"A Mechanically they would have paid the net price to the Jackmans and held back the commission and paid those direct to myself.

"Q In what amount?

"A Three per cent of the commission would amount to three per cent of the sales price.

"Q Why was it three per cent instead of six per cent?

"A   This time I was only claiming what would have been equivalent to the finder's fee rather than a full commission.

"Q   What did Mr. Jackman say to that?

"A   That when the Tenney transaction had been declined that he would be happy to talk to both Blackford and myself in relation to the sale.

"Q   On what basis?

"A   On the basis which—, the former basis which we had been using practically from the start."

Shortly after the Jackmans received plaintiff's letter of January 30, 1964, R. R. Jackman told plaintiff the Tenney deal was off. He also informed plaintiff that his brother, F. C. Jackman, was apparently upset with plaintiff and suggested plaintiff visit his brother in Lawrence to assuage any ill feeling which existed. Heeding the suggestion, plaintiff, together with an employee of Blackford, called on F. C. Jackman. At this meeting F. C. Jackman indicated he would not go along with a sale at that time.

Subsequently, on February 8, 1964, plaintiff called R. R. Jackman and told him Blackford wished to meet with him and try to purchase the stock. R. R. Jackman responded that he and his brother had decided to withdraw their offer of sale. Despite plaintiff's protestations to the effect he had expended considerable time and money in finding a buyer, the Jackmans were not moved. Plaintiff took no further action, but later learned the stock had been sold to Blackford in November 1964.

The trial court concluded that although Blackford became aware of the stock through plaintiff's efforts and later, on his own initiative, negotiated for and ultimately purchased the stock, the evidence did not establish a brokerage contract between plaintiff and defendants. We believe the lower court correctly determined there was insufficient evidence to make a submissible case on the existence of an agency contract as alleged by plaintiff.

The relationship between a seller and a broker is that of agency. An agency exists only by virtue of contract, express or implied. Whether a valid contract has been entered into must be determined by application of the same rules which pertain to contracts generally. There must be consideration, mutuality, and a meeting of the minds in respect to all essential matters. Meeting of the minds may be shown by implication from the conduct of the parties. The burden of establishing agency, like other matters essential in

making out a claim, is upon the party asserting it. (*Hiniger v. Judy*, 194 Kan. 155, 398 P. 2d 305; *Patee v. Moody*, 166 Kan. 198, 199 P. 2d 798.)

Throughout the entire course of trial, plaintiff steadfastly relied on a contract made on or about April 1, 1963, when defendants purportedly agreed to pay plaintiff a three percent commission in the event he brought about a sale of the stock. The existence of such a contract was alleged in the petition and also delineated as a disputed issue in the pretrial order.

Plaintiff views the evidence as establishing a contract made at the Denver meeting in April 1963, when R. R. Jackman agreed to pay Norgren and plaintiff a commission of six percent, which Norgren and plaintiff, on their own, agreed to split between themselves. Plaintiff maintains that when the Norgren deal collapsed plaintiff produced Tenney on the "same contract basis," and this arrangement continued until plaintiff agreed in writing to change the contract for the Tenney introduction only. Plaintiff then attempts to resurrect the earlier agreement made in Denver by saying that when he produced Blackford as a ready, willing, and able purchaser, R. R. Jackman agreed if the Tenney deal fell through, defendants would make "the same offer" to Blackford and the same commission arrangement for plaintiff would be used—that is, three percent rather than six percent because only one broker would be involved. Plaintiff contends Jackman thereby approved continuation of the original agreement calling for a three percent commission to plaintiff, even though Jackman may not have been previously aware of the side agreement between Norgren and plaintiff.

Defendants urge, and we think rightly so, that this is not a case of mere variance between pleadings and proof, but rather a complete failure of proof of the existence of an agency contract calling for the payment of a commission by the defendants.

In the first place, the evidence leaves much to be desired in respect to a purported three percent commission agreement growing out of the Denver meeting. The agreement actually entered into at that time was for payment of a six percent commission to plaintiff and Norgren. The splitting of the commission came about as the result of the side agreement to which defendants were not parties. Assuming, however, the soundness of plaintiff's argument that the Denver meeting gave rise to an agreement entitling him to a three percent commission in the event he alone brought

about the sale of the stock, we believe a fair assessment of the evidence can only lead to the conclusion that such an agreement did not continue beyond the Norgren transaction. From that time on there was no agreement or contract between the parties whereby defendants obligated themselves to pay plaintiff a commission.

At the inception of the Tenney negotiations in August 1963, R. R. Jackman made it clear to all concerned that defendants were not to be responsible for the payment of a commission or finder's fee. In apparent recognition of this fact, plaintiff wrote the letter of January 30, 1964, expressly releasing defendants from any liability for compensation in that "particular transaction." Prior to the letter, however, plaintiff had begun negotiations with Blackford, and in his conversation with R. R. Jackman on January 9, 1964, Jackman told him if the Tenney deal did not materialize defendants would make "the same offer" to Blackford. Contrary to plaintiff's contention, "the same offer" could only refer to the offer then outstanding to Tenney, which relieved the defendants from payment of any commission. Plaintiff's attempt to breathe life back into the original agreement with his testimony quoted earlier is, in our view, completely unjustified. The testimony fails to raise a reasonable inference that R. R. Jackman agreed that he and his brother would pay any commission to plaintiff. At most, it was susceptible to the interpretation that any commission would be handled in the same manner as in the Tenney transaction.

As already indicated, a broker's contract is to be treated the same as any other contract. There must be a meeting of the minds in respect to all essential matters. The broker must have been employed to negotiate the contract in connection with which his services were rendered, and his employment must have been by the person from whom the commission is claimed (*Gleichenhaus v. Pratt,* 190 Kan. 1, 372 P. 2d 273; *Patee v. Moody,* supra).

After a careful review of the record, we must conclude that at the time plaintiff produced Blackford as an alleged ready, willing, and able buyer, there was insufficient evidence from which a jury could find the existence of the employment contract relied on by plaintiff.

The judgment is affirmed.