No. 45,819

F. A. Fox, *Appellant*, v. Massey-Ferguson, Inc., a Foreign Corporation, *Appellee*.

(476 P. 2d 646)

Opinion filed November 7, 1970.

*Van Smith*, of Corley, Braun & Smith, of Garden City, argued the cause and was on the brief for the appellant.

*Dale E. Saffels*, of Fleming, Haag, Saffels & Hope, of Garden City, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Fontron, J.: This is an action to recover damages alleged to have resulted from a conversion of three combines. Trial was commenced before a jury. At the conclusion of the plaintiff's evidence the trial court sustained a motion for directed verdict and entered judgment for the defendant. The plaintiff has appealed.

For the origin of this lawsuit we must turn back the pages of time to the 28th day of June, 1966. On that date the plaintiff, Mrs. F. A. Fox of Coleharbor, North Dakota, who, with her husband Earl, operated a custom combining business in conjunction with their farming operations, purchased three combines from the de-

fendant, Massey-Ferguson, Inc., (sometimes referred to herein as Massey) through the company's office at Garden City. The machines were purchased with the view of taking them directly to Canada for resale to an implement dealer at Porcupine Plains, Saskatchewan. A down payment of $3,750 was made on the purchase price of the machines and a remaining balance of $8,928.45 was secured by a conditional sale contract coming due in four monthly installments commencing August 1, 1966.

Before the machines could be delivered to Porcupine Plains, ill luck intervened in the form of a hail storm which wiped out a major portion of the wheat crop in that vicinity. Hence the machines could not be sold and they were returned to Coleharbor for the winter.

None of the monthly payments due on the machines were paid and on May 15, 1967, the Massey representative from Minneapolis, a Mr. Beardsley, visited Mr. and Mrs. Fox in Coleharbor where an agreement was reached under which an immediate payment of $300 was to be made and an additional $1200 (sometimes referred to as $1250) was to be paid when Mr. Fox called for the machines in June to move them from Coleharbor to climes further south. The $300 payment was made by a check drawn by Mrs. Fox. This check was later dishonored and never paid.

On June 22, 1967, Mr. Fox, who had been planting wheat in Canada, met Mr. Beardsley at a hotel in Bismarck, where he told Beardsley he could not meet the $1200 payment at that time but would need a few more days to get the money. However, he proposed to give a post-dated check for $1200, or $1250 as the case may be, dated July 5, 1967. To this proposal Mr. Beardsley agreed. At the same time a renewal note and agreement was executed by Mr. Fox, acting on behalf of his wife, calling for payment of the balance of the purchase price in three monthly installments commencing August 1, 1967, and containing provisions for retention of title and right to repossess similar to those found in the original conditional sale contract.

Fox thereupon moved the combines to the sun-kissed fields of southwest Kansas, where fields of golden grain beckoned the reaper's restless scythe. Shortly after arriving in Gray County, Kansas, (apparently on June 25, 1967) Mr. Fox was accosted at his motel in Cimarron by two Massey-Ferguson collectors or representatives

from the defendant's Kansas City office who accused Fox of removing the machines from North Dakota illegally and without the company's consent or permission.

From this point on in time, the testimony set forth in the transcript of trial (which has been made available to this court), as well as that summarized in the record, is unclear, vague and highly confusing as to the events which followed, particularly with respect to the sequence in which they occurred. It can fairly be deduced, however, that conversations took place in which the company representatives wanted the entire $1500 paid and the Foxes wanted to retain possession of the combines. Moreover, it is clear that at one point during the negotiations, the Massey agents took peaceable possession of two of the machines without filing legal action (as Massey was entitled to do under both the original and renewal contracts) and placed them on a lot in Montezuma. It is clear also that two days thereafter, at six o'clock a. m. or before, Mr. Fox retook possession of those machines without benefit of court process and thereafter used them in his combining operations.

The present lawsuit seeks damages for loss of business allegedly sustained during the two days when the machines were kept by Massey in Montezuma, plus punitive damages for what the plaintiff contends was an unlawful conversion.

As we have said before, the trial court sustained the defendant's motion for a directed verdict after the plaintiff had concluded her evidence, and the question now confronting us is whether the court erred in so doing.

The motion for a directed verdict is not new to this jurisdiction; it existed under our former procedure. In the present Code of Civil Procedure use of the motion is recognized and expressly sanctioned by K. S. A. 60-250. The purpose of such a motion is well known to the bar of this state—it being designed to test the sufficiency of the evidence which has been introduced by an adversary. An order sustaining the motion has the effect of removing the case from the jury; it amounts to a determination by the trial court that there is no issue of fact to submit for the jury's consideration. (Gard, Kansas Code of Civil Procedure, § 60-250, p. 233.)

So far as the old-timers among us are concerned, the function of the motion for a directed verdict can be explained most simply by pointing out that essentially it serves the same purpose as a

demurrer to the opposing party's evidence, as the demurrer was known in practice prior to adoption of the present Code. (*Weber v. Wilson*, 187 Kan. 214, 356 P. 2d 659.) Likewise, the tests to be employed in evaluating the evidence on a motion for directed verdict are similar to those used in yesteryears on a demurrer. In 3 Vernon's Kansas Statutes Annotated, Code of Civil Procedure, § 60-250.3, p. 219, it is said:

"Insofar as standards to be applied by the court are concerned, when a motion for directed verdict is made, the court must draw all fair and rational inferences from the evidence in favor of the party opposing the motion, and to that party give every favorable intendment of the evidence, and a verdict can not be directed unless the evidence is insufficient to sustain a verdict for the non-moving party. See generally, Barron and Holtzoff, Federal Practice and Procedure, § 1075."

It is difficult, at best, to divine from the plaintiff's brief the precise basis on which she predicates her right to recover damages in this action. On one page of the brief she cites authority holding that a mortgagee may not take the law into his own hands and remove mortgaged property by force, threats or violence, without being liable in damages for conversion (although the same authority recognizes that a mortgagee who deems himself insecure may take possession, if the mortgage permits, provided he acts in an orderly manner and without creating a breach of the peace). On the next page plaintiff contends that Massey waived its right to possession by demanding the full purchase price—and that efforts were made to raise the money. With respect to these two variant contentions it may be said there is no evidence that the defendant's agents committed any breach of the peace in taking possession of the combines, nor is there evidence they ever demanded the full purchase price.

It was only upon oral argument that counsel for the plaintiff defined her position in this fashion: That an agreement had been made in Gray County whereby she was to pay Massey $1500, which would take care of her own dishonored $300 check as well as Earl's post-dated one, in return for which she could keep possession of the combines subject, of course, to terms of the renewal agreement.

We have combed the transcript in a search for evidence to support this theory of recovery, despite its last minute advocacy by plaintiff's counsel. Applying the standard we believe must be used in appraising evidence as against a motion for directed verdict,

we have concluded that the evidence introduced by Mrs. Fox, and the inferences which reasonably may be drawn therefrom, is susceptible to the interpretation that an agreement was made in Gray County along the lines advanced by plaintiff. at oral argument.

However we find no evidence of record that either Mrs. Fox or her husband paid the $1500 to Massey's representatives prior to the time the latter took possession of the combines and removed them to Montezuma—or at any other time for that matter. Neither is there evidence to suggest that plaintiff personally or through her husband offered to pay, or tendered, that amount to Massey's agents in Gray County.

It is true that at one point in his testimony, Mr. Fox stated he secured a $1500 advance from a farmer on a combining job (the farmer testified it was $1000) which he gave to his wife so she could meet with Massey's men in Dodge City as they had requested, but Mrs. Fox herself testified she did not meet the men in Dodge City; that she was late for the appointed meeting and the men had left shortly before her arrival. The record and transcript are silent as to what later meetings, if any, were held and is entirely barren of any evidence to suggest that plaintiff ever offered a $1500 payment to the defendant's agents or that she was deprived by them of an opportunity to do so.

We are constrained to hold that the trial court committed no error in sustaining the defendant's motion for a directed verdict, and its judgment is affirmed.