No. 46,724

PHILIP KARRIGAN, *Appellant*, v. NAZARETH CONVENT & ACADEMY, INC., and G. REX STONE, *Appellees*.

(510 P. 2d 190)

Opinion filed May 12, 1973.

*John Berglund,* of Clay Center, argued the cause, and *William L. Rees,* of Topeka, was with him on the brief for the appellant.

*John F. Stites,* of Manhattan, argued the cause and was on the brief for appellee G. Rex Stone.

*Charles L. Davis, Jr.,* of Topeka, argued the cause and was on the brief for appellee Nazareth Convent & Academy, Inc.

The opinion of the court was delivered by

FOTH, C.: This is a medical malpractice action in which a gall-stone patient complains of the postoperative care rendered him by his surgeon and hospital. At the close of plaintiff's case the trial court directed a verdict in favor of both defendants; a new trial was denied and plaintiff has appealed. The ultimate issue is whether, from the facts established by plaintiff's evidence, a jury could have found a failure on the part of either the doctor or the hospital to conform to accepted norms of reasonable care. This, in turn, depends on the extent to which expert testimony is required to establish the accepted norms.

The facts are not in serious dispute. Where they are, because of the directed verdict we view them in time-honored fashion in the light most favorable to plaintiff. We also draw from those facts the inferences most favorable to plaintiff which may fairly be drawn. *Lord v. Jackman,* 206 Kan. 22, 476 P. 2d 596; *Fox v. Massey-Ferguson, Inc.,* 206 Kan. 97, 476 P. 2d 646.

On June 16, 1966, plaintiff entered St. Mary Hospital in Manhattan, Kansas, suffering from jaundice and an upset stomach, the result of an acute gallstone condition. The hospital is accredited, and is operated by the defendant-appellee Nazareth Convent & Academy, Inc. The following day he underwent surgery at the hands of the defendant-appellee Dr. G. Rex Stone, a certified general surgeon. The operation was successful and plaintiff recuperated nicely for the next two weeks. Dr. Stone planned to discharge him from the hospital on July 1 if he felt up to going home.

On June 30, the day before the contemplated discharge, there remained but one impediment. That was a T-tube which had been inserted as a routine part of the operative procedure to provide drainage through an aperture in the plaintiff's abdomen. All other tubes had been removed. At 11:00 a. m. that day Dr. Stone examined the plaintiff, cut a stitch holding the T-tube in place, and removed the tube. This was done by pulling: plaintiff said the doctor "jerked" it out: the doctor said he did not "yank" it, but that "considerable pull" is required to remove a T-tube because the T portion inside the body must be folded. The doctor watched for a few minutes to see if there would be bile drainage from the fistula where the tube had been. When he was satisfied with the result he dressed the opening and left. The plaintiff made no complaint of any pain to the doctor while he was there.

It is with the events of the next ten and one-half hours that this lawsuit is largely concerned.

Dr. Stone's activities for the rest of that morning are a matter of conjecture. He had no record or recollection, but speculated that he may have been making rounds at the other hospital in Manhattan or perhaps have been engaged in surgery. During the afternoon, however, he was in his office seeing patients. He heard nothing of plaintiff or of any difficulty he might be having, and it seems safe to assume that he put this particular patient out of his mind for the time being.

At 9:30 p. m. Dr. Stone's evening rounds brought him once more to plaintiff's side. He found his patient in a condition he described at one point in his testimony as "seriously ill" and at another as "critical."

It appears that shortly after Dr. Stone left the plaintiff experienced pain (described by him as "severe") just below his right shoulder blade; the nurses on duty attempted to locate Dr. Stone but were unable to do so. They did reach his partner, a Dr. Bascom, and secured an order to administer demerol to relieve the pain. This was done at 11:35 and again at 11:45. For lunch he had meat, potatoes and gravy; when he expressed reluctance he was assured that he should go ahead and eat it. His right arm was so painful he had to eat with his left hand. By 2:00 that afternoon he was vomiting, and by 3:00 complaining of blood in the vomit. He was described as "apprehensive," and perspired freely.

The pain in plaintiff's abdomen, back and shoulder continued throughout the afternoon and evening; he made frequent complaints of pain and nausea and repeatedly asked for a doctor. The nurses responded to each of his calls—by midnight, thirteen in all —but their records reveal no effort to notify Dr. Stone of plaintiff's condition after the initial call at 11:10 a. m. when they reached Dr. Bascom. Neither did they attempt to secure any other medical attention for him. At one point—fearing, he said, that he was going to die—plaintiff asked for a priest.

A prime complaint was his inability to void his bladder. He repeatedly asked to be catheterized, to no avail. At 7:30 p. m. he was given a warm bath and voided about "half as much as he needed to." There is some intimation that the bath could only have been the result of a doctor's order, but the record reflects no such order. Dr. Stone, of course, denied knowledge of any difficulty plaintiff was having.

Upon Dr. Stone's arrival at 9:30, he promptly diagnosed plaintiff's immediate problem as acute gastric dilatation, or distension of the stomach. This, he said, was caused by a paralysis of the pylorus and intestinal tract which prevented the stomach contents, gastric juices and digestive acids, from proceeding from the stomach into the intestine. Gastric dilatation, according to Dr. Stone, is a symptom of some underlying condition. The possibilities which came to mind and which he recorded at the time were either pancreatitis or a leak from the T-tube causing chemical peritonitis.

To alleviate the condition the doctor utilized a stomach pump, with a tube to the stomach through the nose, which together with vomiting removed some 1,000 cc. of dark coffee-ground material from the plaintiff's stomach. A catheter produced 250-300 cc. of dark urine.

The doctor's contemporary notes indicate: "Complaining of pain in lower abdomen—cannot evaluate accurately as patient seems withdrawn and peculiar mental attitude. Frankly doubt that any serious organic disease present but will treat as such as precaution." The result of this caution was the introduction of intravenous fluids to which were added chloromycetin, a powerful, broad spectrum antibiotic.

Later that night plaintiff's pulse and blood pressure were up, he had a fast heart beat, and Dr. Stone was notified. He found, among other things, that the stomach pump was clogged up. It was necessary to remove the tube passing through plaintiff's nose and replace it with a larger one, containing larger intake holes.

The night of June 30-July 1, Dr. Stone ordered regular blood counts; he recorded an oral report of 30,000 on July 1, and of 32,700 the next day. The record reflects no testimony as to the significance of these figures. Other tests were inconclusive as to the cause of plaintiff's gastric dilatation, but Dr. Stone testified that in due course he ruled out both pancreatitis and biliary or chemical peritonitis, his first-reaction hypotheses.

What did develop was pneumonia in the right lung, diagnosed as such on July 5. This condition required further surgery on July 12 and an additional twenty-seven days in the hospital. Plaintiff was finally discharged from the hospital on July 27, and from Dr. Stone's care on August 15, 1966. The cause of the pneumonia is likewise undetermined, although Dr. Stone testified that plaintiff had a collapse of a portion of the lung which might have been caused by his failure to breathe deeply—which might, in turn, have

been caused by the pain he suffered. Such a collapse, the doctor said, traps non-sterile air behind it and permits infection to build up in that area.

Plaintiff sued for his physical and mental pain and suffering, the expense of his prolonged hospital stay, and his loss of income during a three month period in which he says he was unable to work.

The pre-trial order recites numerous acts of alleged negligence on the part of each defendant. As to Dr. Stone they may be broadly categorized as: improperly removing the T-tube by jerking; failing to attend to or arrange for other medical attendance for plaintiff during the crucial ten and one-half hours; and failing to give proper instructions to the nurses as to their duties during that period.

As to the defendant hospital, it was alleged that it failed to notify Dr. Stone or to secure other medical attendance for plaintiff during the ten and one-half hours his condition was deteriorating; that its nurses were not properly trained and instructed to handle a condition such as plaintiff's; that its laboratory services were not available when needed; and that the stomach pump it furnished was faulty.

At trial plaintiff chose to open his case with the deposition of Dr. Stone. After it had been read to the jury each defendant elected to put the doctor on the stand for cross-examination. Plaintiff claims it was error to permit them to do this, and that they should have waited until the presentation of their own cases to examine him. We see no merit to this contention. Because he was an adverse party plaintiff was entitled to use Dr. Stone's deposition under K. S. A. 60-226 (*d*) (*2*) (now K. S. A. 1972 Supp. 60-232 [*a*] [2] ). *Aspelin v. Mounkes*, 206 Kan. 132, 476 P. 2d 620; *Taylor v. Maxwell*, 197 Kan. 509, 419 P. 2d 822. But when he did so we think it had the same effect as if he had called the doctor to the stand. Under K. S. A. (now 1972 Supp.) 60-243 (*b*) the defendants were entitled to cross-examine him "upon the subject matter of his examination in chief." The scope of such cross-examination was, of course, subject to the discretion of the trial court, and reversal would flow only from a showing of abuse resulting in prejudice. See, *e. g., Frame, Administrator v. Bauman*, 202 Kan. 461, 449 P. 2d 525. No such showing is made here.

This brings us to the crux of this lawsuit. In directing a verdict in favor of both defendants the trial court found, in effect, that to establish the allegations of negligence on the part of each defendant expert testimony was required:

". . . I will say this, and you gentlemen know it, that proof of malpractice, in effect requires two evidentiary steps, it requires evidence as to the regular standards of the medical community in a particular kind of case and the showing that the physician or the hospital as the case may be, or both, or either, negligently departed from the standards in its treatment of the plaintiff. Now, things which any layman can see and understand don't require expert testimony. In the Menson case, not long ago, an anesthesiologist left a metal plate in the patient's throat and the patient nearly strangled and would have died in another hour, if a specialist hadn't been called, saw that, and yanked it out and threw it on the bed without taking the patient to surgery and said there wasn't time for that. Doctors make mistakes, no question about that, so do hospitals and so perhaps do courts, not perhaps, very definitely. In any event, I won't mention the doctor's name, it's a recent case, for some reason or another a tube was pulled partially out of a patient and cut off flush with his side and he was sent home with a tube in there, there was another case with a scalpel or some sizable instrument left in the wound, and all those things are things that laymen can see and understand and it doesn't take expert testimony to establish it; but there are certain things which are not well known or obvious to the layman and that requires expert testimony, and gentlemen that's the situation we have in this case, and this court has reached the conclusion that the plaintiff's evidence fails to establish actionable negligence against either of these defendants and so the court is sustaining both of these motions for directed verdict."

In so ruling the court was applying rules developed by this court over the years, summarized in *Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636, and reiterated in *Collins v. Meeker*, 198 Kan. 390, 424 P. 2d 488. In *Goheen* the standard of care of both doctors and hospitals was set forth (Syl. ¶¶ 1 and 3):

"The relationship between a physician and his patient, implied in law, is that he possesses that reasonable degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices or similar communities, having due regard for the advance in medical or surgical science at the time, and he will use such learning and skill in his treatment of the patient with ordinary care and diligence.

"A private hospital is bound to exercise toward a patient such reasonable care as his known condition may require, the degree of care being in proportion to his known physical and mental ailments. The extent and character of the care that a hospital owes its patients depends upon the circumstances of the particular case, and the measure of duty of a hospital is to exercise that degree of care, skill and diligence used by hospitals generally in the community and required by the express or implied contract of the undertaking."

*Collins* spoke to the mode of proof, and while it dealt directly with only doctors the principle enunciated applies as well to hospitals:

"Expert medical testimony ordinarily is required to establish negligence or lack of skill on the part of a physician or surgeon in his diagnosis of a

case, his performance of surgical procedures and his care and treatment of a patient, except where results are so patently bad as to be manifest to lay observers or as to come within the general knowledge and experience of mankind." ( *Collins v. Meeker,* supra, Syl. ¶ 3.)

In this case plaintiff introduced no expert testimony to establish a standard of care for either the doctor or the hospital. The closest his evidence came to expert testimony was the introduction of portions of three medical texts identified by a physician witness as reliable authorities under K. S. A. 60-460 ( *cc* ). Summarized most favorably to plaintiff, these exhibits tend to establish; that a T-tube should be withdrawn by a steady pull, not a sudden jerk; that acute dilatation of the stomach occurs when least expected, and is to be treated by use of a stomach pump; that such treatment is simple and effective if the condition is detected early; and that early diagnosis and prompt treatment of peritonitis is desirable.

None of these tended to show that Dr. Stone was negligent in leaving an apparently healthy patient in the care of the hospital nurses from 11:00 in the morning until 9:30 at night. There was nothing to indicate that the removal of a T-tube was a particularly hazardous medical procedure requiring more frequent postoperative surveillance by the doctor. All indications were that it was a routine final step before the patient went home.

There was some testimony from the doctor who put his imprimatur on plaintiff's medical texts that *he* usually checked *his* gallstone patients four to five hours after removing the T-tube. He refused to say that waiting ten and one-half hours was not good medical practice, but did say that he would feel uncomfortable if he waited that long. Even then, he thought it would be acceptable if the patient were checked by a good surgical nurse. As to Dr. Stone we think this was insufficient to establish either the "degree of learning and skill ordinarily possessed by members of his profession and of his school of medicine in the community where he practices or similar communities," or that he failed to "use such learning and skill in his treatment of the patient with ordinary care and diligence." ( *Goheen v. Graber,* supra, 1. c.) Generally, "[e]vidence is not admissible to show what another would have done under the circumstances, or that he would have treated the patient in some other way, or to show how defendant's treatment of like cases differed from that of other physicians." (70 C. J. S., *Physicians & Surgeons,* § 62, p. 998. See also, 61 Am. Jur. 2d, *Physicians & Surgeons, Etc.,* § 208.)

There was, additionally, nothing in evidence from which a jury could infer with any reasonable probability that either the doctor's absence during this period, or his "jerking" of the T-tube (if in fact he did so), had any causal connection with plaintiff's later complications. The cause of his pneumonia is a mystery, and neither we nor any other layman could say from this record that plaintiff ever had peritonitis.

Since there was no evidence to establish actionable negligence on the part of Dr. Stone, the trial court properly directed a verdict in his favor.

The situation as to the hospital, however, is a little different. We may put aside the allegations as to the training of its nurses, the availability of its laboratory facilities, and the operability of its stomach pump. There was no evidence as to the nurses' competence or training, the laboratory was shown to be available twenty-four hours a day, and the only "malfunction" of the stomach pump was the stoppage caused by the size of the tube selected by the doctor.

There remains, however, the failure of the nurses to make more than the one attempt to locate Dr. Stone. While the record is somewhat hazy, the jury could well have concluded that the 11:10 a. m. call which reached Dr. Bascom was the only effort made to secure medical attention for the plaintiff during his entire ten and one-half hour ordeal. A majority of this court feels that even a layman might justifiably find this effort inadequate in the light of plaintiff's repeated requests for a doctor, his severe pain, and his apprehensiveness acute enough that he called for a priest. Under these circumstances—with the patient's condition deteriorating to the point where his doctor found him "critical"—it does not seem necessary to require expert testimony to establish that a hospital exercising ordinary skill, care and diligence would have secured a doctor at his bedside. If Dr. Stone could not be reached, the jury might have found it the hospital's duty to secure the presence of some other doctor. Failure to secure a doctor for him without question caused plaintiff at least mental anguish, for which he would be entitled to recover if the hospital had a duty to call one. Since the jury could have so found, it was error to direct a verdict as to the defendant hospital.

Plaintiff also claims error in that, when the trial court directed verdicts in favor of the defendants, it apparently left unresolved Dr. Stone's counterclaim for his fee of $350. It would appear to be a claim which would be severable for trial under K. S. A. (now 1972)

Supp. 60-242 (*b*), but the record is entirely silent on the court's disposition of this aspect of the case. In any event, we are unable to see how this action—or inaction—prejudiced the plaintiff or would require a reversal as to plaintiff's claim against Dr. Stone.

The judgment is affirmed as to the defendant G. Rex Stone. The judgment is reversed as to the defendant Nazareth Convent & Academy, Inc., with directions to grant a new trial.

APPROVED BY THE COURT.

FROMME, J., concurring in part and dissenting in part. The order of the trial judge in directing a verdict in favor of both defendants was eminently correct. The rules which this court laid down in *Goheen v. Graber*, 181 Kan. 107, 309 P. 2d 636, and *Collins v. Meeker*, 198 Kan. 390, 424 P. 2d 488, should be followed and if so the case would be affirmed on appeal.

The record is entirely void of any testimony as to the measure of duty of the hospitals in the community as to the exercise of care, skill and diligence in the treatment of a patient such as the plaintiff. With no yardstick as to what is proper care a jury would be totally unrestrained in its determination of negligence. From the evidence presented neither a jury nor this court can reasonably say the hospital and nurses failed to do a single thing required of them in measuring up to community standards. A condition of pain and apprehension is common in all hospitals. Some patients have a lower level of pain tolerance than others. Every patient's demands may not be in his best interests. How then can a jury or this court say that the hospital is negligent in this case. The judgment of the trial court should be affirmed in its entirety.

KAUL, J., joins in the foregoing concurrence and dissent.

PRAGER, J., concurring in part and dissenting in part: I concur in the judgment of this court that it was error for the trial court to direct a verdict in favor of the hospital. I respectfully dissent as to that portion of the opinion upholding the action of the trial court in directing a verdict in favor of the defendant, Dr. G. Rex Stone. I disagree with the majority in their conclusion that there was not sufficient evidence of negligence on the part of Dr. Stone to justify submission of the case to the jury. At the trial the plaintiff presented the testimony of Dr. Donald E. Strand of Clay Center who testified that one of the greatest dangers following a gallbladder

operation and removal of a T-tube is biliary peritonitis which results from bile leaking into the peritoneal cavity. The evidence is undisputed that complications are relatively common and require surveillance of the patient after a T-tube is removed. Dr. Strand testified on direct examination that it is his practice after removal of a T-tube following gallbladder surgery for him to check his patient within four or five hours after the T-tube is removed. When asked whether or not this would be good medical practice, he answered that all he could say was that this is what they were taught at the KU Medical School and at General Hospital. On redirect examination Dr. Strand again testified that after the T-tube is pulled a patient should be checked at least within a period of four or five hours thereafter. He stated that he himself would feel uncomfortable if he did not check his patient within the four or five hour period. He conceded that such an examination might be conducted by a good surgical nurse. There was no evidence that a good surgical nurse ever examined Mr. Karrigan. Taken as a whole Dr. Strand's testimony was sufficient to raise a jury question as to whether Dr. Stone was negligent in waiting to check the condition of his patient until the lapse of ten and one-half hours after the T-tube was removed.

The evidence is undisputed that shortly after the T-tube was removed by Dr. Stone, Mr. Karrigan suffered intense pain and requested that he be seen by Dr. Stone. This information was communicated to the nurse at 11:10 a. m. The nurse telephoned Dr. Stone at his office but was unable to contact Dr. Stone personally. Dr. Stone's partner prescribed demerol for pain. In my judgment a jury question was presented as to whether or not Dr. Stone had a duty to make further inquiry into Mr. Karrigan's condition rather than waiting ten and one-half hours while Mr. Karrigan's condition deteriorated. I question whether or not the blame for the failure to treat Mr. Karrigan during the ten and one-half hour period should be placed solely upon the nurses at the hospital. Dr. Stone knew the complications commonly resulting from the removal of a T-tube. He was a graduate of Kansas University Medical School where according to Dr. Strand he was taught that it was good practice for a physician to check upon the patient's condition within four or five hours after a T-tube is removed. Dr. Stone's office personnel and partner were informed at 11:10 in the morning that his patient was in pain and that the nurse was trying to get in touch with him. When all of these factors are added together, in my judgment a

jury should have been permitted to determine whether or not Dr. Stone was negligent in delaying ten and one-half hours in getting around to checking on the condition of his patient.

On the issue of a causal connection between delay in treatment and increased injury and damages to Mr. Karrigan, the evidence was undisputed that when postoperative complications do occur, they require specific measures to minimize their effects on the patient and to eliminate them as soon as possible. The earlier a correct diagnosis is established and suitable steps are taken, the more effective is the treatment and the better the prognosis. The evidence here is that following the removal of the T-tube Mr. Karrigan suffered extreme pain, became apprehensive and nauseated, vomited blood, was unable to void, and insisted upon being catheterized. He asked to see a doctor and in desperation requested the presence of a priest. When Dr. Stone finally appeared ten and one-half hours later he found Mr. Karrigan in a condition which Dr. Stone described as "seriously ill" or "critical." I do not believe that under the circumstances it could be held as a matter of law that Mr. Karrigan suffered no injury or damages as a result of the long delay in his treatment.

In my judgment reasonable minds could differ on the issue of Dr. Stone's negligence and whether or not the long delay in treatment resulted in additional injury to the patient. These issues should have been submitted to the jury. I would hold that the trial court was in error in determining them as a matter of law.

FATZER, C. J., joins in the foregoing concurrence and dissent.