No. 65,664

ARTHUR K. SHARPLES, *Appellant*, v. WARREN E. ROBERTS, M.D., and UROLOGY ASSOCIATES OF TOPEKA, P.A., *Appellees*.

(816 P.2d 390)

Opinion filed August 7, 1991.

*Kenneth F. Crockett*, of Topeka, was on the brief for appellant.

*Jeffrey W. Jones*, of Sloan, Listrom, Eisenbarth, Sloan & Glassman, of Topeka, argued the cause, and *Thomas L. Theis*, of the same firm, was with him on the brief for appellee Warren E. Roberts, M.D.

*Wayne T. Stratton*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, argued the cause, and *Harold S. Youngentob* and *Marla J. Luckert*, of the same firm, were on the brief for appellee Urology Associates of Topeka, P.A.

The opinion of the court was delivered by

HOLMES, C.J.: Arthur K. Sharples, plaintiff in a medical malpractice action, appeals from separate orders of the district court granting summary judgment to the defendants Warren E. Roberts, M.D., and Urology Associates of Topeka, P.A. (Urology Associates). The district court found there was insufficient evidence to establish causation between the alleged negligence of Dr. Roberts and the injury or damage plaintiff alleged. The court also found that the action against Urology Associates was precluded by K.S.A. 1990 Supp. 40-3403(h), a section of the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.* (the Act). The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c). We affirm the district court.

On May 1, 1984, plaintiff began seeing defendant, Dr. Roberts, a general practitioner, for treatment of a urinary tract infection.

Dr. Roberts conducted urine tests which revealed 1+ red blood cells in plaintiff's urine and prescribed a broad spectrum antibiotic. The dates of the tests, the type of testing, and the frequency of antibiotic treatment are not disclosed in the record on appeal. Dr. Roberts apparently continued conservative treatment until April 1985 when tests disclosed 2+ red blood cells in plaintiff's urine. At that time, Dr. Roberts ordered an intravenous pyelogram which revealed the presence of a large staghorn calculus (kidney stone) in plaintiff's left kidney. The x-rays and pyelogram also disclosed that there was renal function in both kidneys despite the existence of the large kidney stone.

Upon learning of these results Dr. Roberts referred plaintiff to Dr. Walter Mau, a urologist who was a member of the defendant Urology Associates. Dr. Mau treated plaintiff from April 1985 until March 17, 1986, primarily with antibiotics. During this period, Dr. Mau discussed with plaintiff the possibility of surgery to remove the kidney stone by means of a kidney split operation. For various reasons the surgery was never performed and on April 11, 1986, plaintiff began seeing Dr. Iloreta. According to Dr. Iloreta's medical records, a renal scan was performed on plaintiff on April 29, 1986, which revealed the left kidney was no longer functioning, and on May 23, 1986, Dr. Iloreta determined that a nephrectomy to remove the left kidney was necessary. The operation was performed June 26, 1986.

This action was filed against both defendants on June 20, 1988. The petition named the wrong person as plaintiff, and an amended petition naming the correct plaintiff was filed July 1, 1988. Plaintiff made no independent claims of negligence against Urology Associates, seeking recovery only on the theory of vicarious liability for the alleged negligence of Dr. Mau. Dr. Mau died prior to the time this suit was filed and apparently no attempt was made by plaintiff to assert a claim against Dr. Mau's estate.

Motions for summary judgment were filed by the defendants. The motion of Urology Associates was sustained on the basis that K.S.A. 1990 Supp. 40-3403(h) precluded any recovery from the corporation for the negligent acts of Dr. Mau. Following discovery, the motion of Dr. Roberts was sustained because plaintiff's expert could not testify that the ultimate loss of the plaintiff's kidney was caused by the delay of Dr. Roberts in diagnosing and

treating plaintiff's illness. Additional facts will be stated as necessary in discussing the issues on appeal.

The first issue on appeal applies only to the action against Urology Associates. The issue is framed as being whether K.S.A. 1990 Supp. 40-3403(h) is unconstitutional as violating Sections 1 and 2 of the Bill of Rights of the Kansas Constitution. However, plaintiff additionally argues that the statute does not factually apply to this case.

K.S.A. 1990 Supp. 40-3403(h), enacted in 1986, abrogates the vicarious liability of a health care provider under certain circumstances, stating:

"A health care provider who is qualified for coverage under the fund shall have no vicarious liability or responsibility for any injury or death arising out of the rendering of or the failure to render professional services inside or outside this state by any other health care provider who is also qualified for coverage under the fund. The provisions of this subsection shall apply to all claims filed on or after the effective date of this act."

As previously stated, plaintiff makes no independent claim of negligence against Urology Associates and seeks recovery only upon the theory of vicarious liability for the actions of Dr. Mau.

Section 2 of the Kansas Bill of Rights provides:

"**Political power; privileges.** All political power is inherent in the people, and all free governments are founded on their authority, and are instituted for their equal protection and benefit. No special privileges or immunities shall ever be granted by the legislature, which may not be altered, revoked or repealed by the same body; and this power shall be exercised by no other tribunal or agency."

Plaintiff apparently contends 40-3403(h) is unconstitutional under this provision of the Kansas Bill of Rights because the statute gives "special class treatment to the medical profession." Plaintiff's argument, however, has no merit because this court has repeatedly construed Section 2 as applying solely to political privileges, not to the personal or property rights of an individual. See *Samsel v. Wheeler Transport Services, Inc.*, 246 Kan. 336, 354, 789 P.2d 541 (1990), and cases cited therein.

Section 1 of the Kansas Bill of Rights, the counterpart to the equal protection clause of the United States Constitution, provides:

"**Equal Rights.** All men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness."

The issue whether 40-3403(h) violates Section 1 of the Kansas Bill of Rights was recently decided in *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991). In *Bair*, we found the statute constitutional and that determination governs the plaintiff's arguments here. K.S.A. 1990 Supp. 40-3403(h) does not violate Section 1 or Section 2 of the Kansas Bill of Rights.

Though not framed as a separate issue, plaintiff also contends that 40-3403(h) does not apply to the facts of this case because coverage by the health care stabilization fund (fund) for the alleged negligence of Dr. Mau ceased to exist upon Dr. Mau's death. While it is true that the statute only eliminates the vicarious liability of the employer health care provider for the negligent acts of an employee health care provider when both are "qualified for coverage under the fund," the problem with plaintiff's argument is that it erroneously assumes Dr. Mau no longer had fund coverage following his death.

K.S.A. 1990 Supp. 40-3403(c)(3) provides that "the fund shall be liable to pay . . . any amount due from a judgment or settlement against a resident inactive health care provider." An inactive health care provider is defined in K.S.A. 1990 Supp. 40-3401(g) as a person who had basic coverage under the Act but does not have such coverage at the time a claim is made for personal injury or death "solely because such person is no longer engaged in rendering professional service as a health care provider." Assuming Dr. Mau's coverage was not renewed because of his death, he falls within the definition of an inactive health care provider and has fund coverage under 40-3403(c)(3).

That fund coverage is provided for deceased health care providers when claims are made after the provider's death is supported by K.S.A. 1990 Supp. 40-3403(m). That statute requires that certain inactive health care providers must have complied with the mandatory insurance requirements of K.S.A. 1990 Supp. 40-3402 for a certain number of years as a condition to fund liability but excepts from this requirement "any health care provider *which becomes inactive through death* or retirement." (Emphasis added.)

K.S.A. 40-3412(a) requires an action for personal injury or death based upon malpractice to be brought against the health care provider or inactive health care provider, there being no right of action directly against the fund. K.S.A. 40-3411(a) provides for an action to be brought in a court of appropriate jurisdiction "where the claim is against an inactive health care provider covered by the fund who does not have liability insurance in effect which is applicable to the claim and the claimant and commissioner cannot agree upon a settlement."

We conclude that plaintiff's remedy was to bring his action against the estate of Dr. Mau, as provided by the probate code (K.S.A. 59-2238; K.S.A. 1990 Supp. 59-2239) and the Act, not against Dr. Mau's employer. K.S.A. 1990 Supp. 40-3403(h) is applicable to this case and the court did not err in granting summary judgment to the defendant Urology Associates.

The second issue is whether the trial court erred in granting Dr. Roberts' summary judgment motion based upon its finding there was a lack of expert medical testimony to support causation. In resolving this issue, we are governed by well-established rules which were thoroughly summarized in *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 756 P.2d 416 (1988), as follows:

"Although the question of whether a defendant's actions proximately caused a plaintiff's injury is normally a question of fact for the jury, where the facts of a case are susceptible to only one conclusion, the question is one of law and may be properly subject to summary judgment. *Baker v. City of Garden City*, 240 Kan. 554, 557, 731 P.2d 278 (1987). Summary judgment is governed by K.S.A. 1987 Supp. 60-256, which provides in pertinent part:

'(c) . . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. *Lessley v. Hardage*, 240 Kan. 72, 73-74, 727 P.2d 440 (1986). The party opposing summary judgment, however, has the affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. *Willard v. City of Kansas City*, 235 Kan. 655, Syl. ¶ 2, 681 P.2d 1067 (1984); *Mays v. Ciba-Geigy Corp.*, 233

Kan. 38, Syl. ¶ 5, 661 P.2d 348 (1983). If factual issues do exist, they must be material to the case to preclude summary judgment. *Busch v. City of Augusta*, 9 Kan. App. 2d 119, 123, 674 P.2d 1054 (1983).

"Summary judgment is seldom proper in negligence cases. *Phillips v. Carson*, 240 Kan. 462, 472, 731 P.2d 820 (1987). On the other hand, the appellees do not, in order to prevail in their summary judgment motions, need to prove they were not negligent or that their actions did not cause Jessica's cerebral palsy [the injury]. In *Celotex Corp. v. Catrett*, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986), the United States Supreme Court analyzed Rule 56(c) of the Federal Rules of Civil Procedure, which language is adopted verbatim in K.S.A. 1987 Supp. 60-256(c). The United States Supreme Court held there can be no genuine issue as to any material fact when the plaintiffs offer no proof concerning an essential element of their case. The Court stated:

'One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses and we think it should be interpreted in a way that allows it to accomplish this purpose.' 477 U.S. at 323-24.

"Negligence is never presumed, and may not be inferred merely from a lack of success or an adverse result from treatment. *Tatro v. Lueken*, 212 Kan. 606, 611, 512 P.2d 529 (1973). The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the injury. See *Funke v. Fieldman*, 212 Kan. 524, 535, 512 P.2d 539 (1973). Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation. *Webb. v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978); *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 48-51, 510 P.2d 190 (1973). Expert witnesses must confine their opinions to matters in issue which are certain or probable and not testify as to mere possibilities. *Nunez v. Wilson*, 211 Kan. 443, Syl. ¶ 1, 507 P.2d 329 (1973)." 243 Kan. at 306-08.

The claims of negligence asserted by plaintiff against Dr. Roberts are (1) failure to perform the necessary tests which would have revealed the existence of the staghorn calculus at an earlier date, and (2) failure to refer plaintiff to a urologist sooner than April 1985, which also would have resulted in an earlier discovery of the massive kidney stone. As a result of these delays, plaintiff asserts his general physical condition deteriorated and he ultimately lost the kidney which, absent the delays, might have been saved.

Our decision in this case hinges upon the deposition testimony of plaintiff's expert, Dr. Howard Simon, a urologist with appar-

ently impeccable credentials. In its statement of uncontroverted facts, the trial court found, *inter alia*:

"On the issue of causation, Dr. Simon made several interesting observations. These included his opinions that: the size of a kidney stone does not necessarily correlate to the amount of damage it will do to the kidney; plaintiff's kidney stone had probably existed for years; there was no change in the size of plaintiff's kidney stone or in the cortex of plaintiff's kidney between April, 1985 and January, 1986; in April, 1985, plaintiff's kidney was functioning reasonably; there is no way to tell whether the stone was smaller in May, 1984 than it was in April, 1985; there is no way to tell whether earlier surgery (i.e., in May, 1984 or April, 1985) would have avoided the need for a 'kidney split' operation, which can cause severe damage to the kidney; there is no way to tell whether earlier surgery (i.e., in May, 1984 or April, 1985) would have saved plaintiff's kidney. The most Dr. Simon could say was that it was 'possible' a kidney split wouldn't have been required in April, 1984 (though he admitted that by May, 1985, a kidney split was probably plaintiff's only option); and that earlier surgery on plaintiff 'wouldn't [have] hurt.' "

The trial court then concluded:

"1. In his deposition, Dr. Howard Simon testified that, in his opinion, the defendant, Dr. Roberts, departed from the standard of care as perceived by Dr. Simon in failing to diagnose the existence of the staghorn calculus in plaintiff's kidney, failing to order appropriate tests which would have revealed the existence of the staghorn calculus and failing to refer the plaintiff to a qualified urologist who presumably would have arrived at an earlier diagnosis.

"2. Viewing the testimony of Dr. Simon in the most favorable light, as the Court is required to do when considering a Motion for Summary Judgment, Dr. Simon did not express an opinion that the claimed departure from the standard of care upon the part of the defendant, Dr. Roberts, caused or contributed to the damages suffered by the plaintiff which were the ultimate loss of plaintiff's kidney. The absence of expert testimony to support plaintiff's claim that he suffered damages by reason of the negligence of the defendant Roberts is fatal to the plaintiff's case. The absence of expert testimony on the issue of causation requires that the defendant's Motion for Summary Judgment be sustained.

"The rationale for the Court's decision is that the deposition testimony of the plaintiff's sole expert witness, Dr. Howard Simon, reflects that Dr. Simon, although he was not familiar with the standard of care for family practitioners, was of the opinion that the defendant, Dr. Roberts, departed from the standard of care by failing to perform additional tests to determine the cause of blood in the plaintiff's urine and failing to refer plaintiff to a urologist promptly. The difficulty with Dr. Simon's testimony is that nowhere in his deposition did he affirmatively state that the claimed departures from the standard of care upon the part of Dr. Roberts in any way contributed

to plaintiff's condition or the ultimate loss of plaintiff's kidney by reason of the existence of a staghorn calculus.

"At pages 30 and 31 of his deposition, Dr. Simon testified that there appears to have been no change in the size of the stone in plaintiff's kidney between April of 1985 and January of 1986. At page 37, Dr. Simon testified that he had no way of knowing how long the kidney stone had been present or its rate of growth. At page 59, Dr. Simon testified that in May, 1985, when Dr. Mau first saw the plaintiff, there was adequate and reasonable kidney function and that it was reasonable for Dr. Mau to continue to follow the patient at that time without immediately performing surgery. At page 69, Dr. Simon testified that he could not come to a firm conclusion as to whether, if Dr. Mau had done a kidney split procedure when he first saw the plaintiff, it would have made a difference. Dr. Simon could not come to a firm conclusion as to whether, if plaintiff's condition had been diagnosed a year earlier than when Dr. Mau saw it, it would have made any difference.

"Summarizing Dr. Simon's deposition in its entirety, it may be fairly said that he was of the opinion that the claimed departures from the standard of care upon the part of the defendant, Dr. Roberts, could have contributed to the size of plaintiff's kidney stone and the ultimate loss of his kidney, however, he cannot testify with any degree of medical certainty that it did in fact do so. Without expert testimony as to the issue of causation, the case is not legally submissible to the trier of fact. *Juhnke v. Evangelical Lutheran Good Samaritan Society*, 6 Kan. App. 2d 744, 634 P.2d 1132 (1981); *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 51, 510 P.2d 190 (1973).

"For the foregoing reasons, it is the judgment of the Court that the Motion for Summary Judgment filed by the defendant, Dr. Warren E. Roberts, is sustained and judgment is entered in favor of the defendant."

While plaintiff attempts to establish the necessary element of causation by pointing to certain isolated statements in Dr. Simon's testimony, a careful reading of the entire deposition convinces us that the trial court's summary of the testimony was accurate.

A claim of medical malpractice is based on actionable negligence and requires the same elements of proof as required in any negligence action. In *Durflinger v. Artiles*, 234 Kan. 484, 673 P.2d 86 (1983), the court reviewed at some length the principles applicable to negligence actions and various facets of medical malpractice and held:

"Negligence exists where there is a duty owed by one person to another and a breach of that duty occurs. Further, if recovery is to be had for such negligence, the injured party must show: (1) a causal connection between the duty breached and the injury received; and (2) he or she was damaged by the negligence." Syl. ¶ 1.

The causal connection referred to in *Durflinger* is often equated with the term proximate cause, which has been defined in the following language:

"Proximate cause of an injury is that cause which 'in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury and without which the injury would not have occurred, the injury being the natural and probable consequence of the wrongful act.' *Wilcheck v. Doonan Truck & Equipment, Inc.*, 220 Kan. 230, 235, 552 P.2d 938 (1976)." *St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043 (1989).

The plaintiff bears the burden of proving the necessary causation and normally in medical malpractice cases, this court has described the duty in general terms, merely stating there must be a causal connection between the negligent act and the injury or that the act caused or contributed to the injury. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. at 307; *Lucas v. Pearce*, 223 Kan. 749, 750, 576 P.2d 670 (1978); *Yeates v. Harms*, 194 Kan. 675, 677, 401 P.2d 659 (1965). In *Allman v. Holleman*, 233 Kan. 781, 667 P.2d 296 (1983), a medical malpractice action, we held:

"A party is at fault when he is negligent and his negligence caused or contributed to the event which brought about the injury or damages for which the claim is made." Syl. ¶ 4.

"A negligent act is the proximate cause of an injury only when the injury is the natural and probable consequence of the wrongful act." Syl. ¶ 5.

In the instant case, plaintiff contends that the district court erred in finding no evidence of causation by focusing only on the loss of plaintiff's kidney when plaintiff's allegations were that Dr. Roberts' failure to perform appropriate tests or refer plaintiff to a urologist resulted in plaintiff's general physical deterioration and loss of his left kidney. Dr. Roberts, on the other hand, asserts summary judgment was proper because plaintiff has failed to establish that earlier diagnosis and treatment of his kidney stone would have resulted in a more favorable outcome, specifically, that plaintiff's kidney could have been saved. Additionally, Dr. Roberts asserts that there is no showing that the alleged deterioration in plaintiff's general physical condition would have been altered by an earlier diagnosis or referral.

In order to sustain his burden of proof on the issue of negligence, the plaintiff must ordinarily present testimony by a qual-

ified medical expert who must offer his opinion that the involved defendant either did not possess the requisite degree of learning and skill or failed to use reasonable care and diligence in applying such learning and skill to the treatment of the patient. *Crowley v. O'Neil*, 4 Kan. App. 2d 491, 494, 609 P.2d 198, *rev. denied* 228 Kan. 806 (1980). The rule requiring expert medical testimony in medical malpractice actions applies not only to the issue of negligence, but also to the issue of causation. Expert medical testimony is ordinarily required to establish a causal connection between the plaintiff's injuries and the defendant's negligence. *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 50-51, 510 P.2d 190 (1973); *Yeates v. Harms*, 193 Kan. 320, 333, 393 P.2d 982 (1964), *modified on rehearing* 194 Kan. 675, 401 P.2d 659 (1965).

In *Nunez v. Wilson*, 211 Kan. 443, 507 P.2d 329 (1973), the court discussed at length the requirements for establishing a claim of medical malpractice based upon expert testimony. In doing so, the court held:

"Expert witnesses should confine their opinions to relevant matters which are certain or probable, not those which are merely possible. However, no particular words of art are necessary to express the degree of proof required, and it is sufficient if the expert's words can be interpreted to show reasonable probability." Syl. ¶ 1.

"The expressions 'probably,' 'more likely than not,' and others of similar import are proper qualifications for a medical expert's opinion testimony if, taken as a whole, the testimony reflects an honest expression of professional opinion as to reasonable medical probabilities." Syl. ¶ 2.

Plaintiff does not contend that expert testimony is not required in this case but asserts that when Dr. Simon's testimony is considered under the rules applicable to summary judgment, sufficient causation has been established to raise a question of fact for the jury to decide. However, a careful review of Dr. Simon's deposition, which covers 85 pages, and supporting documents fails to support the plaintiff's contentions.

Nowhere in the testimony did Dr. Simon state that the plaintiff's injury and damage were proximately caused by the delay in diagnosis of the staghorn calculus or the delay in referring plaintiff to a urologist. It is true that Dr. Simon was of the opinion that Dr. Roberts had departed from the acceptable standard of care,

but he could not say with any degree of probability or certainty that the departure caused or contributed to the plaintiff's injury and damage.

The most that can be said of Dr. Simon's testimony is that he was of the opinion that the kidney stone produced infection and thus caused damage to plaintiff's kidney. However, this testimony is insufficient to establish that the delay in testing or referral probably caused or contributed to plaintiff's deterioration in physical condition or the loss of his kidney. The best Dr. Simon could state was that it was possible some injury might have been avoided if the kidney stone had been discovered sooner but that he could not come to any "firm conclusion" either way. Dr. Simon's testimony falls far short of the degree of medical probability or certainty required to support the necessary element of causation. Without expert testimony that the alleged negligence of Dr. Roberts was the proximate cause of the plaintiff's injury, the trial court was correct in granting summary judgment.

Plaintiff also asserts that the trial court was in error in granting summary judgment because discovery had not been completed. However, neither in the trial court nor in this court has plaintiff made any attempt to indicate what additional discovery was required or what it might disclose. Without more, the simple statement that discovery is incomplete does not warrant reversing the trial court.

We conclude that there was no error in the trial court's determination that plaintiff failed to provide evidence of causation necessary to maintain his action against Dr. Roberts and that the granting of summary judgment to both defendants was correct.

The judgment is affirmed.

LOCKETT, J., concurring and dissenting: I concur with the majority's determination that there is insufficient evidence to establish the negligence of Dr. Roberts.

In *Bair v. Peck*, 248 Kan. 824, 811 P.2d 1176 (1991), a majority of this court determined that K.S.A. 1990 Supp. 40-3403(h), which abrogated the common-law vicarious liability of an employer health care provider under circumstances specified in the statute, bears a reasonable relationship or basis to the objectives sought to be obtained by the legislature and does not violate Section 1

of the Bill of Rights of the Kansas Constitution. The majority noted no one has a vested right in common-law rules governing negligence actions which would preclude substituting a viable statutory remedy for one available at common law and that the legislature can modify the common law so long as it provides an adequate substitute remedy for the right infringed or abolished. 248 Kan. at 838-39. It then determined major statutory enactments establishing a broad, comprehensive statutory remedy or scheme of reparation in derogation of a previously existing common-law remedy may be subsequently amended or altered without each such subsequent change being supported by an independent and separate quid pro quo. 248 Kan. at 842, 844.

In *Bair*, I joined the separate dissents of Justice Herd and Justice Allegrucci, which stated that the substitute remedy originally granted by the Health Care Provider Insurance Availability Act, K.S.A. 40-3401 *et seq.*, is not an adequate quid pro quo for the subsequent abrogation of vicarious liability of an employer health care provider as a remedy available to those injured by the negligence of employee health care providers.

Based on the rationale of the dissents in *Bair*, I must also dissent in this case.

ALLEGRUCCI, J., joins the foregoing dissenting and concurring opinion.