Walihan (Wally) HOWARD, Jr., Plaintiff,

v.

TMW ENTERPRISES, INC. f/d/b/a/ Electro–Wire Products, Inc. Autojectors, Inc., and John True, M.D., Defendants.

No. CIV. A. 97–2429–KHV.

United States District Court,
D. Kansas.

Dec. 7, 1998.

George H. Pearson, III, Topeka, KS, John H. Rowley, Austin, TX, Donald T. Taylor, Robb, Taylor & O'Connor, Kansas City, KS, for plaintiff.

David R. Buchanan, Brown & James, P.C., Kansas City, MO, John C. Hansberry, Le-Boeuf, Lamb, McGreene & McRae, LLP, Pittsburgh, PA, Brian J. Niceswanger, McDowell, Rice, Smith & Gaar, Kansas City, MO, Derek H. Potts, Brown & James, P.C., Kansas City, MO, Steven D. Ruse, Shugart, Thomson & Kilroy, Overland Park, KS, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Plaintiff sues TMW Enterprises, Inc. [TMW], his former employer, for failing to maintain a safe workplace; Autojectors, Inc., a machine manufacturer, for products liability; and John True, M.D., for medical negligence. This matter comes before the Court on *Defendant Autojectors, Inc.'s Motion For Summary Judgment* (Doc. # 77), *Defendant John True, M.D.'s Motion For Summary Judgment* (Doc. # 79), and *Defendant TMW Enterprises, Inc.'s Motion For Summary Judgment* (Doc. # 81), all filed September 11, 1998, and the *Supplemental Motion For Summary Judgment Of Defendant TMW Enterprises*, (Doc. # 97) filed October 15, 1998. For reasons set forth below, the Court finds that the motions of Dr. True and TMW should be sustained and that Autojector's motion for summary judgment should be overruled.

### Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A "genuine" factual dispute requires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

In considering a summary motion the Court must view the evidence in the light most favorable to the nonmoving party. *Tom v. First Am. Credit Union*, 151 F.3d 1289, 1291 (10th Cir.1998). Summary judgment may be granted, however, if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson*, 477 U.S. at 250–51, 106 S.Ct. 2505. Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Thomas v. IBM*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### Factual Background

The following facts are uncontroverted or, where controverted, viewed in the light most favorable to plaintiff.

On August 30, 1995, plaintiff suffered an industrial injury while working in the manufacturing plant of Alcoa Fujikara, Ltd. [AFL] in Junction City, Kansas. AFL had purchased the plant from Electro–Wire Inc. (the corporate predecessor of TMW Enterprises, Inc.) on July 1, 1995.[1] Plaintiff had worked

---

1. AFL purchased from Electro–Wire substantially all of the assets and property of Electro–Wire's wire harness manufacturing and sales business. *See* TMW Supplemental Motion, Ex. A. In the agreement, Electro–Wire warranted that it possessed good title to or a valid leasehold interest in the assets of the business, and that the machinery and equipment had "no latent or patent defects and [had] been maintained in accordance with the Seller's usual business practices." *See*

*id.*, agreement ¶¶ 2.05 and 2.14. The agreement also stated

[ELECTRO–WIRE] MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, INCLUDING THOSE REFERRED TO IN SECTION 2–312 OF THE MICHIGAN UNIFORM COMMERCIAL CODE, EXCEPT AS SET FORTH IN THIS ARTICLE II. IN ANY EVENT, SELLERS MAKE NO WARRANTY OF MERCHANTABILITY, SUITABILITY OR

in the Electro–Wire maintenance department since 1993, and he continued to work there after AFL purchased it.

From time to time, as a maintenance worker, plaintiff had to clean excess plastic from the nozzle of an AJ–27 injection molding machine manufactured by Autojectors, Inc. That machine had several safety features to protect workers from injury. Two activation buttons on the front of the machine had to be depressed for the top platen to come down. Further, the machine had a safety sensor to detect if the top platen had come down on someone's hand; if this happened, the safety shield would move up and break the connection with the sensor, and the platens would return to the neutral position. The front of the machine also had an abort button, but it did not function when the machine was in manual mode. Finally, a placard on the machine warned: "danger, disconnect power before working in the mold area." *Plaintiff's Deposition* at 121. Plaintiff understood that if he turned off the electrical power, the hydraulics that move the platens could not move.

When plaintiff first worked at Electro–Wire, he frequently noticed a nickel or penny taped on the machine's safety sensor. He removed the coin on several occasions because he was concerned that someone might get injured, but "it seemed like periodically it would just come right back." *Plaintiff's Deposition* at 27. In fact, his Electro–Wire supervisors instructed him not to remove the coin on the sensor.[2]

In order to power down the machine, workers had to employ a "lock-out-tag-out" procedure. Despite the warning that power should be disconnected before working in the mold area, plaintiff's Electro–Wire supervisors told him to clean the machine in the manual mode rather than locking out and tagging out. *Plaintiff's Deposition* at 19, 32, 121, 133.

On the day of the accident, plaintiff proceeded to clean the machine as he had many times before. A coin covered the safety sensor but he did not remove it, nor did he seek permission to "lock-out-tag-out" because "[i]t didn't benefit the down time and it was a hassle and getting a supervisor to okay it, would have been more problem than anything else." *Plaintiff's Deposition* at 179. Further, plaintiff knew that while he was cleaning the machine, another person could not depress both activation buttons at the same time. *Plaintiff's Deposition* at 131; *Plaintiff's Memorandum In Opposition To The Motion For Summary Judgment Of Defendant John True, M.D.* (Doc. # 92), attachment, *Affidavit Of Walihan Howard* at 1.

Just before the accident, plaintiff put the machine in manual mode, reached through the mold with both hands, and began to clean the injector nozzle with a wire brush. The top platen suddenly and unexpectedly clamped down on his right hand, trapping it against the heated nozzle. Unaware that the abort button would not work in manual mode, plaintiff hit the abort button several times. The machine did not open. Other employees tried to turn the machine off and on, but the mold still would not open. They also tried to pry the mold open but could not. Finally, they turned the power off, cut the hydraulic line, and pried the machine open. Plaintiff's hand had been pressed against the hot nozzle for three to four minutes. Plaintiff sustained serious burns on his hand and surgeons ultimately amputated parts of three fingers.

In the opinion of plaintiff's expert, Wendell C. Hull, Ph.D., the machine was defective because it had neither a control switch (to relieve the hydraulic pressure to the mold) nor a mechanical stop (to prevent the mold from closing during the cleaning process). Further, the injection nozzle leaked continu-

---

FITNESS FOR A PARTICULAR PURPOSE, AS TO THE ASSETS ... OR ANY PART THEREOF. THE FOREGOING DISCLAIMER IS IN ADDITION TO ANY OTHER DISCLAIMER OF SELLERS CONTAINED IN THIS ARTICLE II OR ELSE WHERE HEREIN.
Agreement ¶ 2.15 (capital lettering in original).

The Agreement also stated that from and after the closing, neither Electro–Wire nor any of its affiliates would have any liability or responsibili-

ty for, and AFL would assume and discharge when due, any liability or obligation of or arising out of or relating to the assets or the business. Agreement ¶ 1.06

2. Plaintiff also testified that a supervisor with authority to grant permission to remove the coin was standing next to him at the time of the accident. *Plaintiff's Deposition* at 116–17; 178–79.

ously and hardened plastic had to be manually removed, thus exposing workers to danger. The machine closed on plaintiff's hand because its design relied on a single point, which failed, and the abort button did not function in the manual mode. Also, the machine lacked adequate warning that the abort button did not function in the manual mode. Finally, the safety shield and sensor button were inadequate and easily defeated, even though the manufacturer could reasonably foresee that the machine would be a high production machine and that the owner would be motivated to modify features that slowed production. *See Defendant Autojector, Inc.'s Motion For Summary Judgment* (Doc. # 77), Exhibit D, *Expert Report of Dr. Hull* (May 11, 1998). Dr. Hull also concludes that the machine has a useful safe life of 20 to 30 years, based on its heavy duty construction and replaceable parts, extensive resale listings for machines dating back to the early 1970's, and the fact that the machine was still functional in March of 1998 with no signs of deterioration.

Electro–Wire may have ordered an injection molding machine of the type that injured plaintiff, for delivery on September 6, 1983. The record contains no supporting affidavit, however, which establishes the authenticity of the purchase order which purportedly evidences the transaction. Further, the record contains no evidence that the machine listed on the purchase order is the machine that injured plaintiff.

Dr. John True, the AFL company physician, treated plaintiff's injury. Plaintiff asserts that Dr. True provided negligent medical care for the burn injuries which he suffered. Plaintiff contends that Dr. True discharged him from the hospital without specific wound care instructions or antibiotics and that standards of care required that he receive more frequent wound care (specifically topical and/or oral antibiotic treatment), range of motion and physical therapy, timely debridement, skin grafting, and other wound closure techniques. *Pre-trial Order* (Doc. # 73) filed September 2, 1998, at 6. Plaintiff asserts that a delay in treatment caused loss of tendons and underlying bone and that with appropriate care, his fingers could have been reconstructed instead of amputated. Plaintiff also alleges

that the standard of care required further evaluation of the decreased function in his median nerve, at the time of the initial treatment. Dr. True did not perform further evaluation, and the possibility of nerve compression was not pursued until plaintiff saw another doctor. Plaintiff also alleges that he suffered pain and likely further nerve damage, resulting in permanent numbness, when Dr. True elected to defer operative release of the carpal tunnel until March 1996.

On February 13, 1998, the Court entered a *Scheduling Order* (Doc # 19) which required plaintiff on or before June 30, 1998, to identify any expert witnesses he proposed to call at trial. Plaintiff identified one medical expert, Jeffrey Hall, M.D. Dr. Hall's opinion—set forth in a letter to plaintiff's counsel dated two years earlier, on December 13, 1996—included the following:

> If this sensation [i.e. to Mr. Howard's fingertips] was intact, the patient's fingers *should* have been fingers which *could have been* reconstructed and *become* useful fingers. The photographs do *substantiate* this opinion in that it appears that most of the wounds are confined to the dorsal surface of the fingers . . . .

> At that time [i.e. one week following the incident] by Dr. True's assessment, if the burns had some full thickness component to them, they *would* have benefited [sic] *probably* by surgical debridement at that time . . . . .

> It is my opinion that this is a delay in treatment of this problem [i.e. carpal tunnel syndrome] and that the operative decompression of median nerve was indicated earlier in the patient's course.

*Plaintiff's Memorandum In Opposition,* Doc. # 92, Attachment, *Affidavit Of Jeffrey Hall, M.D.,* Exhibit A at 2 (emphasis added).

In opposing defendant's motion for summary judgment, plaintiff has filed an affidavit which Dr. Hall signed on September 24, 1998, for "clarification and explanation of opinions set forth in his initial report." *See Plaintiff's Memorandum In Opposition,* Doc. # 92, and Attachment, *Affidavit Of Jeffrey Hall, M.D.* While plaintiff has attached this affidavit to his opposing brief, he does not cite the affidavit to specifically controvert

any of defendant's purportedly undisputed facts.[3]

## Analysis

### I. Negligence of TMW

#### A. TMW's negligence as a former employer

Plaintiff asserts that "TMW was negligent in failing to provide a safe workplace when it was plaintiff's employer and such negligence was a proximate cause of his personal injuries and damages." *Pre-trial Order*, Doc. # 73, at 4–5. TMW asserts that it is entitled to summary judgment because TMW never operated the plant under its own name and it thus owed no duty to furnish plaintiff a safe workplace. Plaintiff responds that Electro–Wire Products owned the plant until July 1, 1995, when it changed its name to TMW Enterprises, Inc. *See Plaintiff's Memorandum In Opposition* (Doc. # 92) filed October 1, 1998, Ex. A. Plaintiff sued TMW Enterprises, Inc., formerly doing business as Electro–Wire Products, Inc. and the fact that TMW never operated the plant under its own name does not relieve it of liability.

 Under Kansas law, an employer has a duty to provide a safe workplace and equipment. *See, e.g., Smith v. Massey–Ferguson, Inc.,* 256 Kan. 90, 111, 883 P.2d 1120, 1134 (1994). "The rule is simply that an employer has the duty not to expose his employees to perils which the employer may guard against by the exercise of reasonable care." *Id.* "This includes the duty to exer-

cise reasonable care in furnishing ... appliances, and in keeping them in repair and making inspections and tests." *Prince v. Leesona Corp., Inc.,* 720 F.2d 1166, 1170 n. 8 (10th Cir.1983) (further citation and quotation omitted).

 Unquestionably, during the time that Electro–Wire (now TMW) employed plaintiff at the plant, it owed a duty to provide plaintiff a safe workplace. But when AFL purchased the plant on July 1, 1995, it replaced Electro Wire (now TMW) as plaintiff's employer. When a former employer sells a business, all duties to prevent harm shift from the former employer to the buyer as plaintiff's present employer, and the buyer's failure to prevent such harm is a superseding cause of plaintiff's injuries which relieves the former employer of all liability. *Olson v. U.S. Indus., Inc.* 649 F.Supp. 1511, 1513 (D.Kan.1986) (former employer not liable for injuries plaintiff suffered on equipment he designed for former employer where new employer had purchased equipment "as is" seven months earlier and plaintiff was aware of danger). The Court can conceive of circumstances under which the duty of the former employer might stretch beyond the exact instant of sale. Here, however, plaintiff was injured two months later. The Court agrees with TMW that by the time of the accident, its duties as an employer had shifted to AFL, thus relieving TMW of liability as an employer.[4]

---

3. In his affidavit, Dr. Hall stated:

"When I used the words "may" and "possibly" in my report such as, for example, when I stated 'that more aggressive management may have resulted in a better outcome for his fingers,' I only meant to imply that at that time (and presently) I could not say with absolute certainty that Mr. Howard would have retained his fingers. However, as I stated earlier in the report when I said that 'if this sensation was intact, the patient's fingers *should* have been fingers which could have been reconstructed and become useful fingers,' I believed then (and I still believe) it is more likely than not that such result would have occurred if Dr. True's care had met applicable standards of care."

"Since I rendered that report I have now reviewed a chronology written by Wally Howard, Dr. True's deposition, Wally Howard's deposition, and a report ostensibly from Dr. Baker (although it is not signed by him). Such review of these documents has only strengthened my opinions that Dr. True's care was

below standards of care for a physician who chose to take care of a patient like Wally Howard with the burns and injuries he had, and that had appropriate care been given by Dr. True in reasonable medical probability Mr. Howard would have been able to keep and use his fingers. As to Mr. Howard's median nerve problems, I believe that earlier surgical intervention was called for by Dr. True. Furthermore, if Mr. Howard's median nerve symptomology got progressively worse following the incident, then it is more likely than not that earlier surgical intervention by Dr. True would have diminished or arrested Mr. Howard's then existing, and subsequent residual, problems related to his median nerve."

*See Plaintiff's Memorandum In Opposition* (Doc. # 92) filed October 1, 1998, attachment, *Hall Affidavit,* September 24, 1998.

4. Defendant also argues that if plaintiff bases its claim on defendant's status as a former employer, it is entitled to the defense of assumption of the risk. Plaintiff points out that in Kansas, the

**B. *TMW's negligence as a supplier of chattels***

In asserting that it is not liable as plaintiff's former employer, TMW tacitly acknowledges its potential liability as the supplier of the machine which injured plaintiff. *See Olson,* 649 F.Supp. at 1521–22 (setting out standards for negligence action against former employer who also supplied used machinery outside principal course of its business).

When TMW's predecessor sold the machine to AFL, it disclaimed any implied warranties of merchantability and fitness for ordinary or particular uses. *See* Kan. Stat. Ann. § 84–2–316(2) ("to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous."). On the other hand, TMW's predecessor warranted that the machinery and equipment had "no latent or patent defects." *See TMW Memorandum In Support of TMW's Supplemental Motion For Summary Judgment,* Doc. # 98, Ex. A, Agreement, ¶¶ 2.05, 2.14.

Further, as TMW recognizes in its brief, it may have duties under Section 388, Restatement (Second) of Torts, which details the duties of suppliers of chattels as follows:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

*Memorandum In Support,* Doc. # 98 at 6 (quoting Restatement (Second) of Torts Section 388).

The facts that plaintiff has presented in defending TMW's summary judgment motion might support TMW's liability as a seller of chattels.[5] The problem is that plaintiff failed

---

assumption of the risk defense is generally available only for injuries incurred in the course of employment and where the statutory bar of the worker's compensation act does not apply. *See Smith v. Massey–Ferguson, Inc.,* 256 Kan. 90, 110, 883 P.2d 1120, 1133 (1994) ("This Court's principle reason for maintaining the defense of assumption of risk after the comparative negligence statute had been enacted was based on the line of cases holding that assumption of risk and contributory negligence were separate and independent defenses."); *Tuley v. Kansas City Power & Light Co.,* 252 Kan. 205, Syl. ¶¶ 1–7, 843 P.2d 248 (1992) ("The common-law assumption of risk doctrine is restricted to cases involving employer-employee relationships."). Because the Court has determined as a matter of law that TMW cannot be found liable purely on its status as an employer, the assumption of risk defense does not apply.

5. Whether TMW had reason to know that the machine "is or is likely to be dangerous" under Section 388(a) would be a question for the jury. TMW asserts that it cannot be liable under Section 388(b) because the dangerous condition was readily observable on casual inspection. The Court assumes that defendant means by this that the lack of a safety shield, and the presence of a coin over the sensor [if it was there at the time of sale], were readily observable and that it there-

fore had reason to believe that those for whose use it was supplied would realize "its dangerous condition." In fact, however, Electro–Wire supervisors had instructed workers to bypass the sensor; thus a jury could find that defendant affirmatively led its employees to believe that no dangerous condition existed. Further, TMW cites no evidence that it exercised reasonable care to inform potential users of the facts that made the machine dangerous.

Defendant points out that under Kansas law, "there is no duty to warn of dangers actually known to the user of a product." *Long v. Deere & Co.,* 238 Kan. 766, 773, 715 P.2d 1023, 1029 (1986); *see also* Kan. Stat. Ann. § 60–3305(c) (duty of seller to warn or protect does not extend to safeguards which "reasonable user," with the special knowledge of the user, could and should have taken). TMW argues that it had no duty to warn because plaintiff knew that putting a coin over the safety sensor was dangerous. Viewing the facts in the light most favorable to plaintiff, however, a jury could find that TMW knew that placing a coin over the sensor created a dangerous condition. Further, although plaintiff knew those safety features should not be defeated, he did not necessarily realize the probable consequences if those safety features were not followed. *See Smith,* 256 Kan. 90, 111–121, 883 P.2d 1120, 1135. Thus, whether TMW breached

to set out this theory in its complaint, or more importantly, in the pretrial order. The Court has carefully reviewed the pretrial order and is compelled to conclude that neither plaintiff's factual contentions nor its legal theories can be read to include a claim against TMW as a seller of chattels. Thus, TMW is entitled to summary judgment.

## II. *Manufacturers liability*

Plaintiff alleges that the Autojectors machine was unreasonably dangerous and defective in its manufacture, design and warning, and unsafe for its intended purposes at the time plaintiff used it, and that Autojectors thus violated the Kansas Product Liability Act, K.S.A. § 60–3301 et seq. Autojectors asserts that it is entitled to summary judgment because the machine had passed its useful safe life and because Electro–Wire/ TMW employees altered the machine in a manner that was not foreseeable.

### A. *Useful Safe Life*

Autojectors asserts that plaintiff's claim is barred because under the KPLA, a manufacturer is not liable for injuries caused by a product with an expired useful life. K.S.A. § 60–3303(a)(1). The statute creates a presumption that any harm caused by a product more than ten years after delivery to

its duty as a supplier of the machine, and the degree to which any negligence was a proximate cause of plaintiff's injuries, would also be questions for the jury.

6. Section 60–3303 of the KPLA provides:

a product seller shall not be subject to liability in a product liability claim if the product seller proves by a preponderance of the evidence that the harm was caused after the product's "useful safe life" had expired. "Useful safe life" begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner. For the purposes of this section, "time of delivery" means the time of delivery of a product to its first purchaser or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold.

. . . . .

(b)(1) In claims that involve harm caused more than 10 years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This

the buyer was caused after the useful safe life of the product expired. K.S.A. § 60–3303(a)(1).[6] A plaintiff can rebut this presumption by producing clear and convincing evidence that the useful safe life of the product has not been exceeded.[7] *Gorman v. Best Western Intern., Inc.*, 941 F.Supp. 1027 (D.Kan.1996).

Autojectors asserts that it has presented uncontroverted evidence that the machine which injured plaintiff was delivered to Electro–Wire more than ten years before plaintiff's injury. Autojectors relies upon an Electro–Wire purchase order for an Autojector Model HS–30–S injection molding machine to be delivered by September 6, 1983. As plaintiff points out, however, no summary judgment proof establishes the authenticity of this document, or proves that the machine listed in the purchase order is the machine that injured plaintiff. Moreover, even if Autojectors had produced uncontroverted admissible evidence that the machine had been delivered to Electro–Wire more than ten years before plaintiff's injury, plaintiff has presented evidence to rebut the ten year useful life presumption.[8]

Plaintiff's expert, Dr. Hull, concluded that the machine has a useful safe life of 20 to 30 years. His opinion relies in part upon its

presumption may only be rebutted by clear and convincing evidence.

7. Courts have disagreed about the evidentiary standard that should be applied in deciding a summary judgment motion on the useful safe life defense. This Court has found that "[i]n ruling on a summary judgment motion, the Court is bound by the United States Supreme Court's decision in *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (ruling on summary judgment motion necessarily implicates substantive evidentiary standard of proof that would apply at trial.)." *Grider v. Positive Safety Mfg. Co.*, 887 F.Supp. 251, 253 n. 2. (D.Kan.1995). In any event, on the facts of this case, the Court would reach the same result under either the clear and convincing or preponderance of the evidence standard.

8. Plaintiff's expert affidavit addressing the useful safe life issue was not filed until September 20, 1998, after the deadline for revealing expert opinions. *See* Fed.R.Civ.P. 26(a). As plaintiff points out, however, the purchase order on which Autojectors relies for the date of delivery was not produced until September 11, 1998.

heavy duty construction and replaceable parts, and the fact that the machine was still functional in March of 1998, with no signs of deterioration. *See* K.S.A. § 60–3303(a) (evidence that is especially probative in determining whether useful safe life has expired include amount of wear and tear, effect of deterioration, and normal practices with respect to repairs, renewals and replacements); *see also Strunk v. Lear Siegler, Inc.*, 844 F.Supp. 1466, 1469 (D.Kan.1994) (overruling motion for summary judgment on useful safe life presumption based on expert testimony that useful safe life exceeded ten years and machine was not subjected to excessive wear and tear). Such evidence is sufficient to rebut the statutory presumption and to create a jury question whether the useful safe life of the machine had expired.

### B. *Modification of the machine*

Autojectors also asserts that it is entitled to summary judgment because Electro–Wire employees altered the machine after delivery, thus relieving it of liability for defective design. Under Kansas law, if a product is modified after delivery to the purchaser, the manufacturer may not be liable for defective design. *See Burnette v. Dow Chem. Co.*, 849 F.2d 1269, 1274–75 (10th Cir. 1988). The manufacturer must show, however, that the product modification was not foreseeable. *See Mason v. E.L. Murphy Trucking Co., Inc.*, 769 F.Supp. 341, 345–46.

Autojectors asserts that by taping a coin over the safety sensor, Electro–Wire employees modified the machine. Plaintiff does not deny that a coin was taped over the safety sensor, or that the coin placement constituted a product modification. Rather, plaintiff asserts that Autojectors has not shown as a matter of law that such modification was unforeseeable. Autojectors responds that it could not foresee that Electro–Wire workers would disengage the safety sensor that was designed to protect them from injury.

Plaintiff has presented evidence that Autojectors recognized that nozzle drool might be a problem. Because the machine was designed for high production, shutting it down to clean the nozzle drool would clearly be undesirable. The Court cannot conclude as a matter of law that defendant could not reasonably foresee that workers would modify

the machine to by-pass the safety shield under these circumstances. *See St. Clair v. Denny*, 245 Kan. 414, 420, 781 P.2d 1043, 1047 (1989) (except where only one inference can be drawn from facts, foreseeability is question for jury).

### III. *Medical Malpractice Claim*

Plaintiff asserts that Dr. True was negligent in providing medical care for his injuries. Dr. True seeks summary judgment, asserting that plaintiff has failed to cite expert testimony that he proximately caused plaintiff's injury. Under Kansas law, in order to prove medical malpractice, plaintiff must show that the physician was negligent—that he breached the applicable standard of care—and that the negligence caused the injury. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416, 420 (1988). In order to meet this burden, plaintiff ordinarily must produce expert medical testimony. *See Sharples v. Roberts*, 249 Kan. 286, 295, 816 P.2d 390, 397–98 (1991). "Except where the lack of reasonable care or the existence of proximate cause is apparent to the average layman from common knowledge or experience, expert testimony is required in medical malpractice cases to establish the accepted standard of care and to prove causation." *Bacon*, 243 Kan. at 307, 756 P.2d at 420 (citing *Webb v. Lungstrum*, 223 Kan. 487, 490, 575 P.2d 22 (1978); *Karrigan v. Nazareth Convent & Academy, Inc.*, 212 Kan. 44, 48–51, 510 P.2d 190 (1973)). Thus, to avoid summary judgment, plaintiff must present expert medical testimony that the physician failed to perform his duty of care and that the injury plaintiff complains of was the proximate result of such failure. *Sharples*, 249 Kan. at 295, 816 P.2d at 397.

"Expert witnesses must confine their opinions to matters in issue which are certain or probable and not testify as to mere possibilities." *Bacon*, 243 Kan. at 307, 756 P.2d at 420 (citations omitted). Although "no particular words of art are necessary to express the degree of proof required," expert opinion testimony must reflect "reasonable medical probabilities." *Bacon*, 243 Kan. at 307, 756 P.2d at 420. "The expressions 'probably,' 'more likely than not,' and others

of similar import are proper qualifications for a medical expert's opinion testimony if, taken as a whole, the testimony reflects an honest expression of professional opinion as to reasonable medical probabilities." *Nunez,* 211 Kan. at 448, 507 P.2d at 334.

Defendant asserts that plaintiff has failed to identify expert testimony that would support a jury finding of medical malpractice, in that Dr. Hall's opinion is couched only in terms of "might" or "could," and thus does not constitute evidence of either medical negligence or causation. For example, Dr. Hall states that he has "some concerns about how the burns were managed" and adds that "the standard of care would be that the patient would need some sort of wound care either topically or through oral medications [which were not given]." He concludes that the burn injuries "should have been more aggressively managed." Although the Court agrees that the letter containing Hall's opinion is not strong evidence that defendant breached the applicable standard of care, it could support a jury finding that he did. *See Sharples,* 249 Kan. at 286–97, 816 P.2d at 398. Further, although defendant points out that his medical expert is expected to testify that Dr. True did not deviate from the standard of care or cause plaintiff's injury or damages, that opinion merely creates an issue of disputed fact on the question of negligence.

■ Defendant also asserts that plaintiff has failed to cite evidence that any breach of duty caused injury to plaintiff. As defendant points out, Dr. Hall is the only expert on which plaintiff relies. Dr. Hall's opinion contains the following statements concerning causation: "This delay in wound care *may have contributed* to the loss of viability of the tendons and underlying bone"; *"If .... sen*sation was intact, the patient's fingers *should have been* fingers which *could have been* reconstructed and become useful fingers" and finally, "more aggressive management *may have resulted in a better outcome* for his fingers." *Brief In Support Of Defendant John True, M.D.'s Motion For Summary Judgment* (Doc. # 80), Exhibit C (emphasis added). This testimony is stated in terms of possibilities about what could have happened or what may have happened. It is not evidence that defendant's alleged breach of the standard of care probably or likely caused injury to plaintiff.

Plaintiff arguably has recognized that Dr. Hall's expert report of December 1996 did not conclude that Dr. True's alleged negligence probably caused further damage to plaintiff's fingers, hands or wrists. *See Plaintiff's Memorandum In Opposition To The Motion For Summary Judgment Of Defendant John True, M.D.* (Doc. # 92) filed October 2, 1998. Thus plaintiff now relies upon an affidavit which Dr. Hall signed September 24, 1998, "with his clarification and explanation of opinions." *Plaintiff's Memorandum In Opposition* (Doc. # 92), Attachment, *Affidavit Of Jeffrey Hall, M.D.* In his affidavit, Dr. Hall unequivocally states his opinion that "had appropriate care been given by Dr. True in reasonable medical probability Mr. Howard would have been able to keep and use his fingers" and that "it is more likely than not that earlier surgical intervention by Dr. True would have diminished or arrested Mr. Howard's then existing, and subsequent residual, problems related to his median nerve." *Plaintiff's Memorandum In Opposition* (Doc. # 92), Attachment, *Affidavit Of Jeffrey Hall, M.D.,* at 2.

The scheduling order in this case specifically provided that

Plaintiff no later than **June 30, 1998,** will provide defendants the information required under Fed.R.Civ.P. 26(a)(2)(B) pertaining to expert witnesses expected to be called at trial. No later than **July 30, 1998,** defendants will provide like information to plaintiff. If necessary to refute the disclosed opinions of an expert witness, plaintiff no later than **August 14, 1998,** may provide the information required under Fed.R.Civ.P. 26(a)(2)(B) for any rebuttal expert witnesses.... Expert witnesses whose reports have not been timely furnished to opposing counsel will not be permitted to testify. *Nor shall experts be permitted to testify to opinions not included in the reports timely furnished.*

*Scheduling Order* (Doc. # 19) filed February 13, 1998.

■ Dr. Hall's affidavit was not timely filed under the scheduling order. Further, even if the Court were to construe the affida-

vit as a request to extend the time to file a Rule 26 expert opinion, D. Kan. Rule 6.1 provides that an extension of time will not be granted unless the motion is made before the expiration of the specified time, except upon a showing of excusable neglect. The affidavit was not filed until October 2, 1998, long after the time for filing the expert opinion information had passed. Plaintiff has made no showing of excusable neglect. *Cf. Summers v. Missouri Pac. RR Sys.*, 132 F.3d 599, 604 (10th Cir.1997) (district court abused discretion in finding that plaintiff failed to show good cause under Fed.R.Civ.P. 16(b) to modify scheduling order to allow plaintiff to add expert testimony after original expert disqualified). The Court denies plaintiff an extension of time to file the affidavit. The affidavit is therefore not properly considered in determining whether summary judgment should be granted.

Plaintiff failed to timely produce expert testimony that Dr. True's alleged negligence more likely than not caused injury to plaintiff. Defendant True is therefore entitled to summary judgment.

**IT IS THEREFORE ORDERED** that *Defendant TMW Enterprises, Inc.'s Motion For Summary Judgment* (Doc. # 81) filed September 11, 1998, and the *Supplemental Motion For Summary Judgment Of Defendant TMW Enterprises* (Doc. # 97) filed October 15, 1998, be and hereby are **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Defendant Autojectors, Inc.'s Motion For Summary Judgment* (Doc. # 77) filed September 11, 1998, be and hereby is **OVERRULED.**

**IT IS FURTHER ORDERED** that *Defendant John True, M.D.'s Motion For Summary Judgment* (Doc. # 79) filed September 11, 1998, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that *Defendant John True, M.D.'s Motion In Limine To Exclude The Testimony Of Plaintiff's Expert, Jeffrey Hall, M.D., Or, Alternatively, To Limit Such Testimony To the Opinions Previously Disclosed In Discovery* (Doc.

# 105) filed November 16, 1998, is hereby denied as moot.